## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

ITC HOLDINGS CORP.,
a Michigan corporation,

        Plaintiff,

v.                        Case No.:
                        Hon.

CARL A. HUSLIG,
        Defendant.
_____/

## VERIFIED COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, ITC Holdings Corp. ("ITC"), by and through its attorneys, Vercruysse Murray, P.C., states the following against defendant Carl A. Huslig:

## INTRODUCTION

1.    This action arises out of the breach and/or threatened breach by defendant Carl Huslig of the Employment Agreement between the parties, as amended by a Letter Agreement dated June 27, 2012 (collectively, "Agreement").

2.    The Agreement restricted defendant, Carl Huslig, from engaging in any business that directly or indirectly competes with the business of ITC or its affiliates in any geographical area within 100 miles of where ITC or its affiliates manufactures, produces, sells, leases, rents, licenses or otherwise

provides its products or services, and precluded him for using or disclosing ITC's confidential and trade secret information.

3.      Defendant's actions constitute a breach and/or threatened breach of the Agreement, and Defendant has refused from ceasing and desisting his misconduct, thereby forcing Plaintiff to commence this action.

4.      In the Agreement, the parties expressly agreed that "in the event of a breach or threatened breach, . . .  the Company, without posting any bond, shall be entitled to  . . .  obtain equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available."  Plaintiff now, *inter alia*, seeks to exercise that remedy.

## JURISDICTION AND VENUE

5.      Plaintiff, ITC, is a Michigan corporation, with its principal place of business located in Novi, Michigan.  It is therefore a citizen of the State of Michigan.

6.      Defendant Carl Huslig was a citizen of the State of Kansas at the time Plaintiff's causes of action accrued and, on information and belief, continues to be a citizen of the State of Kansas at the time of the filing of this lawsuit.

7.     The amount in controversy exceeds Seventy-five Thousand ($75,000.00) Dollars, exclusive of interest, costs and attorney fees.

8.     There is an action between citizens of different states, and this Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(1).

9.     This Court has personal jurisdiction over Defendant pursuant to Michigan's long-arm statutes, MCL §§ 600.705 and 600.715, and venue is appropriate in this Court.  As an Executive Director of one ITC subsidiary and President of another ITC subsidiary, Huslig made numerous working trips to Michigan during his employment with ITC and, on information and belief, made trips to Michigan in the commission of his wrongful acts towards ITC, which were intended to and in fact did cause harm to ITC in Michigan.  On information and belief and in violation of his non-competition with ITC, Huslig became part of the management of and acted as a Senior Advisor to a competing Michigan company, Grid Capital Partners LLC ("Grid Capital"), with its headquarters located in Milford, Michigan, which was formed shortly after Huslig's termination of employment with ITC.  More recently and on information and belief, Huslig met with the owner of Grid Capital and a Texas attorney who focuses on the electric industry transactions and regulatory matters in or around Detroit, Michigan, as part of their concerted actions to compete with ITC.  Huslig has also sought the protections and benefits provided

by the laws of the State of Michigan, as shown by the choice of law provision in the Agreement.   In addition, many of the trade secrets and much of the confidential business information misappropriated by Huslig originated in or were taken from the State of Michigan.

10.     This Court has jurisdiction to enter injunctive relief pursuant to the contract between the parties, Michigan's Uniform Trade Secrets Act, MCL 445.1903, Michigan's non-competition agreement statute, MCL 445.774a, and Michigan's common law.

## PARTIES

11.     Plaintiff, ITC, a Michigan corporation, is in the business of developing, owning, and operating high voltage electric transmission lines and facilities by and through its subsidiaries.   For purposes of reference, ITC owns and operates the high power electric towers and transmission lines often seen next to expressways and across farm fields.

12.     Up and until July 12, 2012, Huslig was employed by ITC as the Executive Director of ITC Grid Development, LLC and President of ITC Great Plains, LLC, both high level positions within ITC.

## GENERAL ALLEGATIONS

13.     ITC is a publicly traded, independent electric transmission company, which invests in the electric transmission grid to improve system

4

reliability, expand access to markets, lower the overall cost of delivered energy, and allow new generating sources to interconnect to its transmission systems.

14.     Through its subsidiaries, ITC owns and operates high voltage transmission facilities and offices in Michigan, Iowa, Illinois, Minnesota, Kansas, Oklahoma, Missouri, and Arkansas.  Through ITC Grid Development and its subsidiaries, the Company also focuses on expansion in areas where significant transmission system improvements are needed.

15.     Upon Huslig being promoted to the Executive Director position within ITC on or about July 20, 2009, his job duties included, but not limited to, the following:

- •  Actively represented, advocated, and communicated the strategy and performance related to ITC Great Plains both internally and externally.
- •  Participated and advocated in industry and stakeholder forums to advance the company's goals and objectives.
- •  Actively represented, promoted, and positively positioned ITC Great Plains throughout the communities, state(s), and region.
- •  Worked collaboratively with ITC Grid Development to:   (1) Identify, investigate and evaluate new business opportunities and develop detailed business plans for new transmission projects, strategic business alliances and transmission acquisition opportunities in the ITC Great Plains region; and (2)  Develop and maintain corporate relationships with strategic partners and regional stakeholders beneficial to the ongoing success of ITC.

16.     In his high level positions, Huslig was placed in a position of trust and confidence and was privy to and involved in ITC's strategic planning as it

5

relates to its transmission development in the Great Plains region and beyond. He was also integral in developing and shaping the ITC's transmission development strategy as it relates to the ITC's overall strategic plan.

17.     Huslig's duties also entailed identifying, investigating, and evaluating new business opportunities and developing detailed business plans for new transmission projects, strategic business alliances, and transmission acquisition opportunities in the Great Plains region and beyond.

18.     Huslig was also provided access to ITC's business partners and resources to encourage the development of strong personal relationships with ITC's present and future business partners on ITC's behalf.

19.     Huslig also had regular access and was privy to ITC's confidential, proprietary, and trade secret business information.  For example and without limitation, Huslig had regular access to documents and information regarding ITC's strategic and business marketing plans, new business presentations and/or proposals, business processes and summaries, profit margins, business revenues, pricing strategies, employee lists, sales and marketing information, training and operations material and memoranda, computer software and systems, and financial information concerning or relating to the business (collectively, "Confidential Information").

20.     In his positions, Huslig participated in making high level decision-

making regarding ITC's development and expansion strategies.

21.     To protect the secrecy of and ITC's substantial investment in the development of its Confidential Information and to preclude interference between ITC and its business partners and protect potential business opportunities, Huslig and ITC entered into an Employment Agreement on or about July 20, 2009, that imposed limitations on Huslig both during and after his employment (Exhibit 1).

22.     In his Employment Agreement, Huslig agreed not to compete with ITC, directly or indirectly, during his employment and for a one year period after the termination of his employment:

7.     Non-Competition

a.     Employee acknowledges and recognizes the highly competitive nature of the business of the Employer and its affiliates and accordingly agrees as follows:

(i)     During the Employment Term and in the event of a termination of Employee's employment for any reason, for a period of twelve (12) months following the date Employee ceases to be employed by the Employer (the "*Restricted Period*"), Employee will not, whether on Employee's own behalf or on behalf of or in conjunction with any person, firm, partnership, joint venture, association, corporation or other business organization, entity or enterprise whatsoever ("*Person*"), directly or indirectly solicit or assist in soliciting in competition with the Employer, the business of any customer or prospective customer:

(A)   with whom Employee had personal contact or dealings on behalf of the Employer during the one-year period preceding Employee's termination of employment;

(B)   with whom employees reporting to Employee have had person contact or dealings on behalf of the Employer during the

7

one year immediately preceding Employee's termination of employment; or

   (C) for whom Employee had direct or indirect responsibility during the one year immediately preceding Employee's termination of employment.

   (ii) During the Restricted Period, Employee will not directly or indirectly:

   (A) engage in any business that competes with the business of the Employer or its affiliates (including, without limitation, businesses which the Employer or its affiliates have specific plans to conduct in the future and as to which Employee is aware of such planning) in any geographical area that is within 100 miles of any geographical area where the Employer or its affiliates manufactures, produces, sells, leases, rents, licenses or otherwise provides its products or services (a "*Competitive Business*");

   (B) enter the employ of, or render any services to, any Person (or any division or controlled or controlling affiliate of any Person) who or which engages in a Competitive Business;

   (C) acquire a financial interest in, or otherwise become actively involved with, any Competitive Business, directly or indirectly, as an individual, partner, shareholder, officer, director, principal, agent, trustee or consultant; or

   (D) interfere with, or attempt to interfere with, business relationships (whether formed before, on or after the date of this Agreement) between the Employer or any of its affiliates and customers, clients, suppliers, partners, members or investors of the Employer or its affiliates.

23. In his Employment Agreement, Huslig further agreed to maintain the secrecy of and not use without authorization ITC's Confidential Information during his employment and thereafter:

   8. Confidentiality.

a. Employee will not at any time (whether during or after Employee's employment with the Employer) (i) retain or use for the benefit, purposes or account of Employee or any other Person; or (ii) disclose, divulge,

reveal, communicate, share, transfer or provide access to any Person outside the Employer (other than its professional advisers who are bound by confidentiality obligations), any non-public, proprietary or confidential information - including without limitation rates, trade secrets, know-how, research and development, software, databases, inventions, processes, formulae, technology, designs and other intellectual property, information concerning finances, investments, profits, pricing, costs, products, services, vendors, customers, clients, partners, investors, personnel, compensation, recruiting, training, adverting, sales, marketing, promotions, government and regularity activities and approvals - concerning the past, current or further business, activities and operations of the Employer, its subsidiaries or affiliates and/or any third party that has disclosed or proved any of same to the Employer on a confidential basis ("*Confidential Information*") without the prior written authorization of Employer's Board of Directors.

24.     As part of the termination of Huslig's employment with ITC, effective July 12, 2012, the parties entered into a Letter Agreement that extended certain terms and conditions of his Employment Agreement and modified Section 7(a)(ii)(A) in that agreement, as follows:

(A)     engage in any business that competes with the business of the Employer or its affiliates in any geographical area that is within 100 miles of any geographical area where the Employer or its affiliates manufactures, produces, sells, leases, rents, licenses or otherwise provides its products or services ( a "Competitive Business").

(Exhibit 2)

25.     In the Letter Agreement, the parties further agreed to extend the non-competition period to three years or upon making the final payment under that agreement, whichever is earlier.

26.     In consideration for Huslig's promises, including without limitation

the extension of the non-competition period, ITC agreed to pay Huslig approximately $762,958.68 over a three-year time period, with $695,214.08 having already been paid to Huslig.

27.    ITC just recently learned that Huslig has been violating his Agreement notwithstanding that ITC had paid hundreds of thousands of dollars to Huslig in exchange for his promises not to compete.

28.    More specifically, in August 2014 a hotel reservation was emailed to ITC to confirm the reservation of two hotel rooms located at the Detroit Metropolitan Airport under the name of Huslig and a Texas attorney, Beth Emery, then working for Husch Blackwell, LLP.  When contacted by an ITC Executive Assistant regarding this misdirected email, Huslig asked her to keep it confidential and "You Know That I Cannot Do Any thing IN Michigan per my non compete but ..." (sic, capitals in the original).   (Exhibit 3)

29.    While employed with ITC and on its behalf, Huslig regularly interacted with Southwest Power Pool ("SPP"), a Regional Transmission Organization ("RTO"), and its members.  SPP independently operates regional electric transmission grids, and is charged with increasing efficiencies and allows for and manages transfers of generated power to where it is needed.

30.    SPP's members include municipal systems, generation and transmission cooperatives, wholesale generators, power marketers, and

independent transmission companies, such as ITC.  SPP also provides a forum for industry members to collaborate and develop business relationships concerning related developments and projects.

31.     Sunflower Electric Power Corporation ("Sunflower"), a generation and transmission cooperative, is a member of SPP.  When Huslig was employed, he worked and negotiated with Emery, who represented Sunflower at the time, in developing and consummating a business relationship between ITC and Sunflower.

32.     Given the planned meeting between Emery and Huslig in Detroit, Michigan, as shown by the misdirected hotel room confirmation, ITC began investigating whether Huslig was acting in violation of his non-competition agreement.  During the investigation, ITC learned that Huslig had been soliciting a municipal energy association in Kansas to invest in a transmission development project using municipal funding and told the association that he had been working on and/or completed similar projects, including one with the Oklahoma Municipal Power Authority.  This activity was in violation of his non-competition agreement.

33.     ITC's investigation also showed that a new Michigan limited liability company, Grid Capital, was formally organized in December 2012 by another former ITC employee, Edward Rahill, who was also responsible for

development activities while he was an ITC employee.  Huslig had reported directly to Rahill while employed at ITC.

34.    Capital Grid has been described as a "consultancy focused on the electric transmission, regulate and merchant power models," focusing on "high voltage Electric Transmission and power infrastructure verticals." (Exhibit 4)

35.    In that company's business profile, Huslig is listed as a Senior Advisor and used to be part of Capital Grid's management team.    On information and belief, Huslig was part of the creation and/or operation of this consulting firm to assist competitors of ITC.

36.    On or about March 7, 2014, Rahill, presumably acting in concert with Huslig, created a Delaware limited liability company called GCP Transmission Holdings, LLC.    Thereafter the name of that company was changed to GridLiance Heartland, LLC.

37.    Also on or about March 7, 2014, Rahill, presumably acting in concert with Huslig, created a Delaware limited liability company called South Central MCN LLC, a/k/a South Central Municipal - Cooperative Network, LLC ("South Central").

38.    Following the meeting between Huslig, Emery, and presumably Rahill in August 2014 in or about Detroit, Michigan, Huslig created a Kansas limited liability company by the name of Huslig Consulting, LLC, using his

home address as his office in Lawrence, Kansas, which is within the geographic scope of his modified non-competition agreement.

39.    On his LinkedIn profile, Huslig describes himself as a Senior Advisor for Huslig Consulting since September 2012, and providing "executive level consulting to the Electric Utility Industry with an emphasis on the transmission business."   (Exhibit 5)

40.    On or about August 29, 2014, Rahill, and presumably in concert with Huslig and Emery, registered GCP Transmission Holdings, LLC as a foreign corporation in Missouri.  On information and belief, the company's office is located in Kansas City, Missouri, which is within the geographic scope of Huslig's modified non-competition agreement.

41.    On or about September 17, 2014, one of Emery's partners at Husch Blackwell LLP filed a trademark registration with the United States Patent and Trademark Office, seeking to register the service mark of "GridLiance," with Capital Grid being the owner.

42.    On or before September 30, 2014, the name of GPC Transmission Holdings, LLC, was changed to GridLiance Heartland, LLC.

43.    In October 2014, Emery apparently left her employment with Husch Blackwell LLP.  She described on LinkedIn that she was "focusing on electric industry business transactions and regulatory matters" while she was

employed by Husch Blackwell, LLP. In September 2014, she became the Senior Vice President, General Counsel & Secretary at GridLiance Power Networks. (Exhibit 6)

44.     On information and belief, GridLiance Power Networks is part of GridLiance Heartland, LLC, and, on information and belief, is controlled and/or operated by Grid Capital, Rahill, and Huslig with the goal of developing and competing for electric transmission projects.

45.     On or about October 7, 2014, Rahill, presumably in concert with Huslig, registered South Central as a foreign corporation acting in Missouri.

46.     According to the records of SPP, Emery is the General Counsel for South Central, operating out of Kansas City, Missouri.

47.     South Central is now listed by SPP as a qualified applicant for request for proposals in 2015.  Accordingly, Huslig, by and through South Central, is directly competing against ITC. (Exhibit 7)

48.     ITC's investigation further has shown that as early as June 2014, South Central and GCP Transmission Holdings, LLC were working to obtain a co-development agreement with the Oklahoma Municipal Power Authority in competition with ITC. (Exhibit 8)  On information and belief, Huslig was part of that transaction and project.

49.     These new companies, Grid Capital, GridLiance Heartland, and South Central are posed to generate income by developing and assisting with the operation of high-voltage transmission facilities in the geographical area sets forth in Husig's non-competition agreement.

50.     Huslig, through these new competitors, is working on developing electric transmission operations and facilities that would involve long-term investors, governmental municipalities, and potentially municipal bonds, which would operate for decades once the infrastructure has been built.   This underlying foundation might take years to develop and the participants might not be known publicly until much of that foundation has been built.

51.     Once that foundation has been developed, it would be difficult if not impossible to unwind those operations even though it was done in blatant violation of Huslig's promises and obligations to ITC.

52.     It would be difficult if not impossible to ascertain ITC's full monetary damages caused by Huslig's breach, given the number of persons and entities that would be involved in the funding and development of said operations and facilities and the number of years that such operations would continue.

53.     Most likely, Huslig has or will obtain large commissions and financial awards once those operations have been funded, while at the same

time Huslig has been receiving large payments from ITC in consideration for him not to compete against ITC.

54.     On October 8, 2014, ITC wrote to Huslig to advise him that it had obtained information about his misconduct that showed he had been engaging in an actual and/or threatened breach of his Agreement, as well as his other fiduciary, statutory, and common law duties owed to ITC.   (Exhibit 9). Nonetheless, Huslig refused to cease and desist from his continuing misconduct.

55.     Upon information and belief, Huslig has utilized ITC's confidential, proprietary and trade secret information in his solicitation of new projects in working with Grid Capital, GridLiance, and South Central.

56.     Since his departure from ITC, Huslig has and will necessarily be called upon to use and disclose the confidential and proprietary information and materials he acquired at ITC in providing almost identical development services to these new competitors.

57.     Upon information and belief, Huslig has misappropriated ITC's trade secrets, solicited ITC's customers and potential customers, and have attempted to misappropriate its business opportunities and expectancies for his own benefit.

58.     ITC has no adequate remedy at law for the actions of Huslig since

the damages ITC has suffered, and will continue to suffer, in connection with his assistance with the development of new competitors on large transmission projects and the use and/or disclosure of Confidential Information and trade secrets, as well as the loss of ITC's competitive edge, goodwill, and fair competition, are unascertainable and incapable of exact proof, causing ITC irreparable harm.

59.    Unless restrained preliminarily and permanently enjoined, Huslig and those acting in concert with him will continue to violate ITC's rights by continuing to violate the terms and conditions of his Agreement for the benefit of himself and others, as well as using ITC's confidential and proprietary information, causing irreparable harm to ITC.

## COUNT I
## BREACH OF CONTRACT

60.    ITC realleges each and every allegation contained in paragraphs 1-59, inclusive, of this Complaint as though completely set forth herein.

61.    Huslig's actions as described above constitute breaches and/or threatened breaches of the terms of his Agreement.

62.    As a proximate result of Huslig's violations of his contractual obligations, ITC will be irreparably injured because ITC has no adequate remedy at law for his actions and because the damages ITC will suffer in connection with its loss of customer goodwill, loss of its investment in

obtaining customers and developing transmission projects, its loss of future business opportunities, and the divulgence of Confidential Information and trade secrets, as well as loss of its competitive position, are unascertainable and incapable of exact proof.

63.     Huslig, and those acting in concert with him, will, unless restrained preliminarily and permanently, continue to violate ITC's rights, and he will continue to ignore his contractual duties to ITC by continuing his attempts to assist others to compete with ITC for long-term electric transmission projects, interfere with ITC's opportunities to generate relationships with potential business partners, and use and/or disclose ITC's Confidential Information, thereby causing ITC irreparable harm.   Accordingly, a preliminary and permanent injunction restraining and enjoining Huslig and all those acting in concert with him from further violating his Agreement is the only remedy that will afford ITC meaningful relief.

64.     In his Agreement, Huslig acknowledged that his violation of his Agreement would cause irreparable harm to the business of ITC, and he further agreed that, upon an actual or threatened breach, ITC would be entitled to "equitable relief in the form of specific performance, temporary restraining order, temporary or permanent injunction or any other equitable remedy which may then be available."

65.     ITC is also entitled to a recovery of its damages, to the extent that those damages are ascertainable, caused by Huslig's violations of his Agreement and/or the disgorgement of the funds paid to him in consideration for his promises in that Agreement.

66.     Given the long-term violations of his Agreement, ITC also requests that the non-competition provision be extended in the same amount of time that Huslig had been in breach.

## COUNT II
## BREACH OF FIDUCIARY DUTY

67.     ITC realleges each and every allegation contained in paragraphs 1-66, inclusive, of this Complaint as though completely set forth herein.

68.     As the President of ITC Great Plains, LLC, and Executive Director of ITC Grid Development, LLC, Huslig was placed in a position of trust and confidence with ITC which gave rise to fiduciary duties to refrain from diverting business opportunities away from ITC and to refrain from misappropriating and using ITC's Confidential Information, trade secrets, and goodwill for his own benefit.

69.     Huslig's actions in diverting ITC's business opportunities to his own benefit (Huslig Consulting), Grid Capital, GridLiance Heartland, and/or South Central, soliciting ITC's customers and prospects, and misappropriating ITC's Confidential Information, trade secrets, and goodwill for his own benefit

constitute a breach of Huslig's fiduciary duties owed to ITC.

70.    ITC has been damaged through Huslig's breach(es) of his fiduciary duties.

71.    In addition to the above-referenced damages that may be ascertainable, ITC has no adequate remedy at law since the damages ITC has suffered, and will continue to suffer, in connection with the loss of the secrecy of its Confidential Information, as well as the loss of its customer goodwill, lost business opportunities, and expectancies, are unascertainable and incapable of exact proof.

72.    Accordingly, a preliminary and permanent injunction restraining and enjoining Huslig and those working with him from continuing their misconduct is the only remedy that will afford ITC any meaningful relief.

## COUNT III
## <u>VIOLATION OF UNIFORM TRADE SECRETS ACT</u>

73.    ITC realleges each and every allegation contained in paragraphs 1-72, inclusive, of this Complaint as though completely set forth herein.

74.    ITC's strategic and business marketing plans, new business presentations and/or proposals, business processes and summaries, profit margins, business revenues, pricing strategies, and employee lists, sales and marketing information, training and operations material and memoranda, computer software and systems, financial information concerning or relating to

the business, among other information, was developed by ITC at great expense over many years and derive independent economic value from not being generally known or readily ascertainable through proper means to persons other than ITC employees who need to know the information to perform their jobs for ITC.

75.    ITC has taken steps which are reasonable under the circumstances to maintain the secrecy and confidentiality of its confidential and proprietary information, including requiring certain employees to execute confidentiality agreements, admonishing employees to maintain the secrecy of the information and maintain due care with any documents embodying the same, requiring password access to ITC's computer databases, securing its offices, and limiting access to its Confidential Information.

76.    ITC's confidential and proprietary information constitute trade secrets as defined by the Michigan Uniform Trade Secrets Act, MCL 445.1901, et seq.

77.    Huslig has and continues to hold a contractual duty to maintain the secrecy of this information and limit its use.

78.    Upon information and belief, Huslig, directly and through those acting in concert with him, misappropriated ITC's trade secrets by using the information obtained through his employment with ITC and disclosed the

information to competitors.

79.     Huslig, via his counsel, has taken the position that his competitive actions are outside the geographic scope of his modified non-competition agreement and has no intention of ceasing and desisting from his conduct, thereby continuing to put at risk ITC's confidential and trade secret information.

80.     Huslig's misappropriation of ITC's trade secrets was, and is, willful and malicious.

81.     ITC has no adequate remedy at law for Huslig's actions since the damages ITC has suffered and will continue to suffer in connection with the disclosure and use of its trade secrets are unascertainable and incapable of exact proof.

82.     Accordingly, an injunction restraining and enjoining Huslig and those acting in concert with him from continuing their misconduct is the only remedy that will afford ITC any meaningful relief.

## COUNT IV
## UNFAIR COMPETITION

83.     Plaintiff incorporates by reference each of the allegations set forth in paragraphs 1 - 82 above, as if restated word for word herein.

84.     The foregoing conduct of Huslig and those acting in concert with him constitutes an unfair method of competition.

85.     As a consequence of Huslig's conduct, ITC has suffered damages and will continue to suffer irreparable harm and loss.

## RELIEF REQUESTED

Wherefore, ITC requests:

1)     That a temporary restraining order and/or preliminary injunction be issued restraining and enjoining Defendant and all persons acting in concert with him:

a)     From directly or indirectly, and in any manner, using or disclosing any Confidential Information and trade secrets belonging to or originating from ITC, including but not limited to using that information to solicit or service ITC's existing or prospective customers and business partners.

b)     From directly or indirectly competing with ITC, including but not limited to soliciting ITC's customers and prospective customers and/or providing consulting services or assistance to actual or prospective competitors, pursuant to the terms set forth in the Agreement.

c)     From destroying, altering, modifying or concealing any documents, including but not limited to written or printed documents, data, email, and/or correspondence in any way relevant to this action, including but not limited to documents relating to ITC, Defendant's employment, his consulting company, and any of ITC's actual or prospective customers.

And further requiring that:

a)     Defendant immediately return all electronic data and documents that include, contain, or are in whole or in part derived from ITC's Confidential Information, including but not limited to the Confidential Information itself and all copies, summaries, compilations, and reiterations of that information, as well as any other ITC property in his possession or control.

b)     All computer hard drives that have had any of ITC's Confidential Information stored on them, or information derived from ITC's Confidential Information, be immediately made available for inspection and copying by ITC, as well as any and all email correspondence.

2)     That the temporary restraining order and/or preliminary injunction remain in full force and effect until such time as ITC's claim for permanent injunctive relief is heard and decided by this Court.

    3)    That Defendant pay ITC's costs, expenses, and attorneys fees incurred in this action.

    4)    That ITC be awarded its damages to the extent that those damages are ascertainable.

    5)    That such other relief be provided to ITC as may be available in law or equity and that is just under the circumstances.

Respectfully submitted by,

VERCRUYSSE MURRAY, P.C.

By:  s/James E. Roach
James E. Roach (P51792)
31780 Telegraph Rd., Suite 200
Bingham Farms, MI  48025
(248) 540-8019
Attorneys for Plaintiff
jroach@vmclaw.com

Dated:  December 18, 2014

## VERIFICATION

I, Kristine Schmidt, being first duly sworn, deposes and says that she is the President of ITC Great Plains, LLC, a subsidiary of ITC Holdings Corp., Plaintiff in the above-entitled cause, that she has read the foregoing Verified Complaint and knows the contents thereof, that the same is true of her own knowledge or based on a review of corporate business records, except as to matters stated to be on information and belief and that as to those matters, she believes them to be true.

**ITC Holdings Corp.**

By: _Kristine M Schmidt_

STATE OF _Kansas_ )
                                    ) *ss*
_Shawnee_ COUNTY )

Subscribed and sworn to before me this _16th_ day December, 2014.

/s/ _Joanne M Miller_
Notary public, State of _Kansas_
County of _Shawnee_.
My commission expires
_10/30/2018_.

JOANNE M. MILLER
NOTARY PUBLIC
My Appt. Exp.
10/30/2018
STATE OF KANSAS